[Cite as *Montgomery Cty. Treasurer v. Rush Plaza Corp.*, 2025-Ohio-1484.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| MONTGOMERY COUNTY TREASURER | : | |
| | : | |
| | : | C.A. No. 30247 |
| Appellees | : | |
| | : | Trial Court Case No. 2023 CV 01757 |
| v. | : | |
| | : | (Civil Appeal from Common Pleas Court) |
| RUSH PLAZA CORP. ET AL. | : | |
| | : | |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 25, 2025

. . . . . . . . . .

THOMAS J. MANNING, Attorney for Appellant

ROBIN J. MOBLEY, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Rush Plaza Corporation ("RPC") appeals from the judgment of the Montgomery County Common Pleas Court finding a 2012 quitclaim deed invalid and unenforceable and quieting title of the subject real property in Defendant-

Appellee Robin Mobley.   For the following reasons, the judgment of the trial court will be affirmed.

## I.    Procedural History and Facts

{¶ 2} On April 10, 2023, John McManus, as Treasurer of Montgomery County, Ohio ("Treasurer"), filed a complaint for foreclosure of delinquent real estate taxes regarding a property on Hackett Drive in Dayton, Ohio.   The named defendants included RPC, the titled owner of the property, Robin Mobley, the previous owner of the property, an unknown spouse of Robin Mobley, the State of Ohio Department of Taxation, the State of Ohio, and any unknown tenants living on the property.   Relevant here, the complaint alleged that Mobley and her unknown spouse might have claims in the real estate by virtue of a defect in a quitclaim deed purportedly signed by Mobley on September 28, 2011, and recorded on January 31, 2012 ("2012 deed") in the Montgomery County Recorder's Office.

{¶ 3} Mobley filed an answer alleging that the 2012 deed was fraudulent and asking that title to the property be quieted in her name.   RPC filed an answer and cross-claim against Mobley, seeking a declaratory judgment pursuant to R.C. 2721.01 et seq., that the 2012 quitclaim deed transferring the property from Mobley to RPC was valid, created a full ownership interest in the property, and divested Mobley of any interest in the property.   RPC's cross-claim alleged that RPC was owned, operated, and controlled by Demetrious Rush, who died on June 26, 2017.   Rush's estate, which was pending before the Montgomery County Common Pleas Court, Probate Division, included RPC and the Hackett Drive property.

**{¶ 4}** RPC filed a motion for default judgment against Mobley. Mobley filed a memorandum in opposition to RPC's motion for default judgment, which included an answer to RPC's cross-claim and a motion for the court to accept her answer as timely. The trial court granted Mobley's motion to accept her answer as timely and overruled RPC's motion for default judgment.

**{¶ 5}** Hearings were held on January 19 and February 14, 2024, regarding the validity of the 2012 deed. The following testimony was presented at the hearings.

**{¶ 6}** Gregory Moss worked at U.S. Bank in Dayton in January 2012. There was a Key Bank located just down the street, but he never worked at Key Bank. In January 2012, Moss was a duly admitted notary in the State of Ohio and would notarize documents for customers of U.S. Bank. The bank's policy was to only notarize signatures for people who were clients of U.S. Bank, which Moss would verify on the computer prior to notarizing any documents. The bank also had a policy of refusing to notarize quitclaim deeds and, generally, the only deeds notarized at the bank were for second mortgages. Moss testified that if he had been told not to do something, he would not have done it. Moss did not recall notarizing any quitclaim deeds because of the bank policy.

**{¶ 7}** When Moss was asked to notarize a document, it was his routine to take the identification card of the person who was to sign the document. The client would date, sign, and print his or her name on the page in Moss's presence, and Moss would check the signature to make sure it matched on the identification card he was provided. Then Moss himself would fill in the remainder of the document, including the state, county, date, and his own signature. Moss testified that he would only notarize a document if the

person signing it was physically in his presence.

{¶ 8} When shown the January 31, 2012 deed, Moss testified that it contained his signature and his notary stamp on the bottom of page two. However, in the space where the State of Ohio, the County of Montgomery, and the name of the grantor were written, none of that was his writing. Moss explained that it was his routine to fill in that information himself on a deed. If someone came into the bank with the second page already filled in, he had blank pages available and would redo the second page so that it was consistent with his practice. Moss explained that he maintained that routine so that if there were any issues after the fact, he would know that he had notarized the document. After reviewing the document, Moss opined that the 2012 deed had been altered by using a different notarized document that he had in fact notarized.

{¶ 9} Moss kept a log of all persons for whom he notarized documents. However, due to the passage of time, Moss no longer had those records and could not verify if his records reflected that he had notarized the 2012 deed. Due to the amount of time that had passed and how many documents he notarized in any given year, Moss had no independent recollection of notarizing the 2012 deed or notarizing a document for Rush or Mobley.

{¶ 10} Lecester Bean, a notary in the State of Ohio, testified to the notarization process. As a notary, Bean required the individual signing a document to personally be present and to provide identification so that she could verify that the person was who they purported to be and that the signature matched the signature on the individual's identification card. Bean would not notarize a document if it was already signed.

**{¶ 11}** When viewing the 2012 deed, Bean stated that the deed was missing a date on the first page and was therefore incomplete. Bean also testified that on the second page of the deed, there was information that should have been filled in by the notary, not another individual, but was clearly not in the notary's handwriting. Due to the deficiencies, Bean stated that the county recorder's office should not have accepted the deed.

**{¶ 12}** Bean testified that she had met Mobley at a library and reviewed several documents that had Mobley's signature on them along with a writing exemplar and the 2012 deed. Although Bean had no education, training, or experience in handwriting analysis, based on her looking at signatures often as a notary, she testified that Mobley's signature on the 2012 deed was different than the other signatures she had seen belonging to Mobley.

**{¶ 13}** Angela Richmond, a deputy recorder for the Montgomery County Recorder's Office, testified that she was the individual who accepted the 2012 deed at the Recorder's Office. As a deputy recorder, her job was to process documents brought to the Recorder's Office, verify that all the required information was filled out, and confirm that it was an original document.

**{¶ 14}** Richmond testified that on a quitclaim deed, the marital status of the grantor must be identified, which is supposed to be placed next to the name of the grantor. Additionally, the deed must contain a legal description of the property, a preparation statement as to who prepared the document, original signatures, and a notarization. Richmond explained that when accepting a document, she would verify that everything

was filled out, but she would not verify that everything was legitimate or look to see if signatures were the same.

{¶ 15} When Richmond accepted any document, she placed her initials on it as she reviewed it. Richmond had no independent recollection of accepting the 2012 deed, but she identified that her initials were on the document as the person who accepted it at the Recorder's Office. When looking at the 2012 deed, Richmond stated that the marital status was missing. Although the Recorder's Office currently would check for that item, previously it was the responsibility of the Montgomery County Auditor's Office. Richmond could not recall what year the responsibility to check for the inclusion of marital status changed from the Auditor's Office to the Recorder's Office. Richmond could not recall who was responsible for checking for inclusion of the marital status in 2012. Nevertheless, on January 31, 2012, Richmond accepted the 2012 deed and recorded the property transfer.

{¶ 16} Stacey Benson-Taylor, the Montgomery County Recorder, testified that she had met Mobley two or three times in person and spoken with her on the phone several times to discuss the 2012 deed. Based on Mobley's concern about the deed being fraudulent, Benson-Taylor referred the matter to Tyson Dillon of the Montgomery County Prosecutor's Office. Benson-Taylor explained that, as the Recorder, she expressed no opinion regarding the validity or authenticity of the 2012 deed. So long as a document contained all the pertinent information, her office was required by law to accept it and record it. Benson-Taylor was not the Recorder at the time the 2012 deed was filed.

{¶ 17} Benson-Taylor testified that for a quitclaim deed, the Recorder's Office

would look for the grantor's name, the grantee's name, the parcel identification number, the legal description of the property, the grantor's signature, and notarization. The Auditor's Office would determine the validity of the property transfer and look for whether the document included the marital status. The Recorder's Office would not necessarily look to the marital status on a deed unless there was a reason to question it. The Recorder's Office would not reject a deed if no marital status were listed.

{¶ 18} Benson-Taylor testified that the 2012 deed included the grantor's name, the grantee's name, the parcel identification number, the legal description of the property, the grantor's signature, and notarization. Because the 2012 deed had all the information filled out, it was accepted and validly recorded.

{¶ 19} Sherri Mayhill, an employee of Safemark Title, testified that her company had been hired by the Montgomery County Prosecutor's Office to run a title search for the property on Hackett Drive for the tax foreclosure. Safemark Title submitted a preliminary judicial report regarding the subject property. When conducting a title search, the company reviewed documents associated with the property from the Recorder's Office, clerks' offices, bankruptcy court, probate court, the Auditor's Office, and the Treasurer's Office.

{¶ 20} After reviewing the title for Hackett Drive, the preliminary judicial report noted that there was an issue with the 2012 deed relating to insufficient marital status. Mayhill explained that the defect did not mean that it was an invalid transfer of property, just that it would need to be fixed to clear the cloud of title. The report also identified 11 judgment liens against RPC.

{¶ 21} Tyson Dillon, an investigator with the Montgomery County Prosecutor's Office, testified as a court's witness. Dillon had met with Mobley to discuss the 2012 deed. Dillon testified that Mobley advised him that she and Demetrious Rush had entered into a land contract for him to purchase her home in exchange for some cash, a vehicle, and payment of back taxes. According to Mobley, Rush did not pay everything off. When Mobley learned the property was going into foreclosure, she located the 2012 deed that she claimed she had not signed.

{¶ 22} Based on Mobley's statements, Dillon initiated an investigation into Mobley's claims. Dillon verified that Rush was deceased and inquired as to who had been paying the back taxes. Dillon obtained documentation from the Treasurer's Office about three different individuals who had paid taxes on the home. Dillon also reached out to Moss, who was in Georgia, and asked him about the 2012 deed. According to Dillon, Moss did not recall notarizing any document for either Rush or Mobley, but he had performed notarizations for account holders at the bank where he worked.

{¶ 23} As part of his investigation, Dillon obtained copies of publicly-recorded documents that contained Mobley's signature to compare to the one on the 2012 deed. Of the approximately six documents he obtained, he believed the signatures looked "similar" to the signature on the 2012 deed. However, Dillon was not a forensic handwriting expert, and he did not submit any of the signatures to a handwriting expert. Dillon testified that, had the signatures appeared radically different, he might have sent them to a handwriting expert. He did not note any outward signs of fraud in his report.

{¶ 24} Based on his investigation, Dillon determined that he was unable to

interview Rush or prosecute him since Rush was dead, and the statute of limitations had passed. Although Dillon stated that the deed "appeared" to be fraudulent, Dillon did not conclude whether the deed was fraudulent, only that no further investigation would be pursued. Dillon explained that, under these circumstances, where the purported perpetrator was deceased, even if the deed were deemed fraudulent, no criminal prosecution could occur. Rather, it would be up to the alleged victim to pursue civil litigation regarding the fraudulent deed.

{¶ 25} Dillon testified he received information from other county employees during his investigation that Mobley's information differed somewhat from what she initially told him. According to Dillon's investigation, Mobley's timeline of learning when Rush was deceased was inaccurate.

{¶ 26} Mobley testified on her own behalf at both days of the hearings. Mobley explained that in September 2011, she had discussions with Rush about his purchasing her property on Hackett Drive. Mobley had obtained the house in her divorce settlement, and her ex-husband was supposed to pay the taxes on it but did not. Although Mobley was going to sell her house through a realtor, Rush wanted to save money by not involving a realtor or anyone else to handle the transaction. Mobley and Rush agreed that Rush could purchase her home by making installment payments to Mobley for a total amount of $25,000, with a downpayment of a car that Rush claimed was worth $5,000, and paying all the back taxes owed on the house. Mobley submitted a document at trial that she testified she had written in 2011 identifying the agreement she had with Rush. Mobley did not submit a formalized land contract, and one was never recorded.

**{¶ 27}** Pursuant to their agreement, in September 2011, Rush provided Mobley with a vehicle. However, the vehicle was not running well and Mobley learned that the speedometer had been rolled back, so she returned the car to Rush, who agreed to pay her the cash value of the car instead. In October 2011, Rush set up a payment plan with the County to pay the back taxes for the home. Mobley claimed Rush occasionally paid her $100-250 but never paid off the $25,000 that he had agreed to pay for the house. Because Rush did not pay off the agreed amount, Mobley never transferred the property to him. The agreement was for her to transfer the property to Rush after the final payment was made.

**{¶ 28}** Mobley agreed that she had been a client of the U.S. Bank where Moss had worked in 2011. However, she denied that she had signed the 2012 deed and said that the signature on it was not hers. Mobley explained that she had been in a car accident in which she had injured her thumb and could no longer bend it. Because of her injury, Mobley's penmanship and signature were very poor. Mobley submitted several documents showing her legitimate signature, including copies of her driver's license, a survivorship deed, and her social security card. According to Mobley, the signature on the 2012 deed was "too neat" to be her handwriting.

**{¶ 29}** Mobley also testified that she would not have signed her house over to Rush in September 2011 because she was still living in the home at that time. Mobley submitted legal documents sent to her at the Hackett Drive address for her divorce case during the fall of 2011. Some of Mobley's things were still in the house at the time of the January 2024 hearing, because she had not planned to remove all her property until Rush

paid off the house. Mobley stated that she and Rush had agreed that she would leave her property in the home until Rush paid off the house, which did not happen.

{¶ 30} On June 27, 2024, the trial court issued a decision finding the 2012 deed invalid, ordering the last legitimate deed (a July 2, 2010 quitclaim deed that transferred the property from Mobley's ex-husband to her) to be reinstalled, and quieting title to the property in Mobley's name. RPC appealed, but we dismissed the appeal due to lack of a final, appealable order. Upon remand, the trial court issued a nunc pro tunc entry to include the necessary final appealable order language. RPC then filed a timely notice of appeal and was granted a stay of the judgment pending appeal.

## II. Assignment of Error

{¶ 31} RPC's sole assignment of error states:

THE TRIAL COURT ERRED BY HOLDING THAT THE QUITCLAIM DEED TRANSFERRING THE SUBJECT PROPERTY WAS FRAUDULENT AND THAT THE SUBJECT PROPERTY WAS RIGHTFULLY THE PROPERTY OF APPELLEE MOBLEY.

{¶ 32} RPC argues that the trial court erred in concluding that the 2012 deed was invalid for two reasons. First, Mobley was barred by R.C. 5301.07(C) from contesting the validity of the 2012 deed due to the omission of her marital status. Second, Mobley did not prove by clear and convincing evidence that the 2012 deed was fraudulent.

{¶ 33} RPC contends that, because the county recorder accepted the 2012 deed and recorded it on January 31, 2012, there was a rebuttable presumption that it was a

valid, enforceable quitclaim deed. Furthermore, because the 2012 deed had been recorded more than four years prior to the underlying lawsuit, Mobley was precluded from challenging its validity based on the omission of Mobley's marital status.

{¶ 34} Pursuant to statute, a lawfully executed deed must be signed by the grantor and the grantor's signature must be properly acknowledged by a notary. R.C. 5301.01(A); *Citizens Natl. Bank v. Denison*, 165 Ohio St. 89, 93-96 (1956). "A deed that is signed - and acknowledged and recorded - raises a rebuttable presumption that the deed is 'valid, enforceable, and effective,' as well as a rebuttable presumption that the deed conveys the described property." *Byars v. Byars*, 2021-Ohio-3940, ¶ 11 (2d Dist.), quoting R.C. 5301.07(B)(1). However, the presumption may be rebutted by clear and convincing evidence of fraud, undue influence, duress, forgery, incompetency, or incapacity. R.C. 5301.07(B)(2).

{¶ 35} R.C. 5301.07(C) provides as follows:

When a real property instrument is of record for more than four years from the date of recording of the instrument, and the record shows that there is a defect in the making, execution, or acknowledgment of the instrument, the instrument and the record thereof shall be cured of the defect and be effective in all respects as if the instrument had been legally made, executed, acknowledged, and recorded. The defects may include but are not limited to the following:

(1) The instrument was not properly witnessed.

(2) The instrument contained no certificate of acknowledgment.

(3) The certificate of acknowledgment is defective in any respect.

(4) The name of the person with an interest in the real property does not appear in the granting clause of the instrument, but the person signed the instrument without limitation.

**{¶ 36}** RPC argues that because more than four years had passed since the recording of the 2012 deed with the county recorder, Mobley was precluded from challenging its validity based on a defect in the omission of the grantor's marital status. But whether the trial court could consider the validity of the deed based on the defect in the marital status was immaterial, because the real issue in controversy was whether the signature on the 2012 deed purporting to be Mobley's signature had been forged. Mobley contested the fact that she had signed the deed at all and, therefore, the four-year limitation in R.C. 5301.07(C) did not apply. A forged deed is void and ineffective to pass any title or rights to the grantee. *See Shinew v. First Natl. Bank*, 84 Ohio St. 297 (1911), syllabus (a forged instrument is not merely voidable, but void); 22B Am.Jur.2d, Deeds, § 165 (1962, updated 2025) (a forged deed is ineffectual to pass title as it is void ab initio and constitutes a nullity). If the trial court deemed the 2012 deed forged, then the statutory signature requirements had not been satisfied and the presumptions of validity under R.C. 5301.07(B) would not apply. *Byars* at ¶ 18. Here, the trial court found, by clear and convincing evidence, that Mobley had not signed the deed and, therefore, the 2012 deed was void.

**{¶ 37}** RPC next contends that the burden of proof to establish fraud was on Mobley, and she failed to establish, by clear and convincing evidence, that the 2012 deed

was fraudulent.    We do not agree.

{¶ 38} "The presumption of validity attaching to a deed which appears upon its face to have been executed in due form can only be overcome by clear and convincing proof, and the burden of sustaining such burden of proof is on the person challenging the validity of such deed."    *Weaver v. Crommes*, 109 Ohio App. 470 (2d Dist. 1959), paragraph two of the syllabus.    "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established."    *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).    Clear and convincing evidence is "more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases."    *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).    "In reviewing whether the lower court's decision was based upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' "    *Koch v. Ohio Acres4U LLC*, 2018-Ohio-2763, ¶ 25 (7th Dist.), quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

{¶ 39} In this case, the burden of proof was on Mobley to establish by clear and convincing evidence that the 2012 deed was void due to fraud.    There was no dispute that Rush drafted the 2012 deed or that the Recorder's Office accepted the 2012 deed. Although Rush, who died in 2017, could not testify as to what had happened with the signing of the 2012 deed, Mobley and Moss, who purportedly also signed the deed, did testify.

{¶ 40} Mobley admitted that she and Rush had had a land contract for the subject

property. However, Mobley testified she did not sign the 2012 deed and would not have signed it in September 2011. Mobley explained that the parties had agreed Rush would not receive the property until after he paid off the full purchase price of $25,000. Because Rush never paid off the full amount, Mobley never transferred the property to him. Mobley was living in the home in September 2011 and had personal property remaining at the property as of January 2024.

{¶ 41} Mobley further testified that the signature on the 2012 deed was not hers because it was "too neat." This, she explained, was a result of a car accident in which she had injured her thumb and could no longer bend it, resulting in very poor penmanship. While Bean was not a handwriting expert, based on her experience as a notary observing signatures, she testified that Mobley's signature on the 2012 deed did not match other samples of Mobley's signature that Bean had reviewed. Dillon, who also was not a handwriting expert, testified that Mobley's signature on the 2012 deed appeared "similar" to several of Mobley's other known signatures. Dillon, however, did not send out the documents to a forensic handwriting analyst or conduct further investigation, because the purported perpetrator was deceased and the statute of limitations had expired, so no criminal prosecution could occur.

{¶ 42} Perhaps most significant in this case was the testimony of Moss, the purported notary of the 2012 deed. Moss had no independent recollection of notarizing the 2012 deed or notarizing a document for Rush or Mobley. Moss testified that he did not recall signing any quitclaim deeds when employed at U.S. Bank in 2011 based on the bank's policies, and the 2012 deed was not notarized in the manner in which Moss would

have notarized documents at that time. Moss testified he would not have permitted another individual to fill in the information on the second page as it had been on the 2012 deed. Rather, if the information were already filled out, Moss had blank pages available that he would have used so that he could fill in the information himself. Moss testified that he took his job as a notary seriously and that he maintained his routine so that if any issues arose after the fact, he would know whether he notarized the document. Moss testified that although his signature appeared on the 2012 deed, he opined that it was altered from a different document he had notarized.

{¶ 43} RPC argues that Mobley's testimony was self-serving and not supported by expert testimony, and therefore it could not be relied upon to prove by clear and convincing evidence that her signature had been forged. The question of whether the signature on the 2012 deed had been forged was a factual determination. "Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false." *Ledford*, 161 Ohio St. at 478. Deference is extended to the trial court's determination because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Because the trial court found that Mobley's signature on the 2012 deed had been forged, the trial court necessarily must have found Mobley's testimony credible in that respect, and we defer to

the trial court's determination of credibility. Moreover, RPC has identified no requirement, nor have we found one, that expert testimony was necessary in order for the trial court to conclude that the 2012 deed had been forged. Notably, there was no direct testimony presented to contradict Mobley's testimony that she did not sign the deed. Rather, the only other person alive who purportedly also signed the 2012 deed, Moss, opined that it was an altered document, most likely derived from a different document he had actually notarized. His testimony supported the trial court's findings.

{¶ 44} We cannot conclude that the trial court erred in finding that Mobley proved by clear and convincing evidence that the 2012 deed was fraudulent and, therefore, void. RPC's sole assignment of error is overruled.

## III.   Conclusion

{¶ 45} Having overruled the sole assignment of error, the judgment of the trial court will be affirmed.

. . . . . . . . . . . .

EPLEY, P.J. and HANSEMAN, J., concur.